IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RODERICK KEITH COOPER,           §
TDCJ #1186437,                   §
                                 §
            Petitioner,          §
                                 §
v.                               §          CIVIL ACTION NO. H-09-2261
                                 §
RICK THALER, Director,           §
Texas Department of Criminal Justice - §
Correctional Institutions Division,    §
                                 §
            Respondent.[1]       §

## MEMORANDUM AND ORDER

The petitioner, Roderick Keith Cooper (TDCJ #1186437), is incarcerated in the Texas

Department of Criminal Justice - Correctional Institutions Division ("TDCJ"). Cooper seeks

federal habeas corpus relief under 28 U.S.C. § 2254 from a felony conviction that was

entered against him in state court. The respondent has answered with a motion for summary

judgment, arguing that Cooper is not entitled to relief. [Doc. # 11]. Cooper has filed a reply.

[Doc. # 15]. After considering all of the pleadings, the state court records, and the applicable

law, this Court **grants** the respondent's motion for summary judgment and **dismisses** this

case for reasons set forth below.

---

[1]     Rick Thaler has replaced the former respondent, Nathaniel Quarterman, as Director of the
Texas Department of Criminal Justice - Correctional Institutions Division. Therefore, the
Court substitutes Thaler as the proper respondent pursuant to Rule 25(d) of the Federal Rules
of Civil Procedure.

# I.      BACKGROUND

A local grand jury returned an indictment against Cooper in cause number 887345, charging him with capital murder in connection with the deaths of two clerks at a Hollywood Video store in Houston.  At trial, the State presented evidence that Cooper and his cousin, Michael Walls, robbed a Hollywood Video store where Cooper had been employed.  Cooper, who was fired from his employment shortly before committing the robbery, confessed that he shot and killed both of the store clerks on duty after one of them threatened to call the police.  After hearing all of the evidence, a jury in the 184th District Court of Harris County, Texas, found Cooper guilty of capital murder as charged in the indictment.  The same jury sentenced Cooper to life imprisonment.

On direct appeal, Cooper argued that the trial court erred by denying his motion to suppress his tape-recorded confession to police.  Cooper argued further that the trial court erred by sustaining the State's objection to certain testimony from Cooper's brother about an out-of-court statement by Michael Walls, who allegedly admitted that he shot the robbery victims.  Cooper also challenged the legal and factual sufficiency of the evidence.  The intermediate court of appeals rejected all of Cooper's arguments and affirmed the conviction after making a detailed summary of the facts presented at trial, which included Cooper's confession that he fired the fatal shots during the robbery:

> Houston Police Officer M. Batiste testified that, while he was on patrol sometime after 10:00 p.m. on September 4, 2001, he parked his patrol car in the parking lot of a Hollywood Video store on Fondren.  As Batiste was completing some paperwork, a man came up to his patrol car and told him that he thought that something was wrong inside the video store.  Batiste looked

2

inside the store and saw that the lights were on, but he did not see any employees.  He then radioed for additional Houston Police officers to assist him, and, after two more officers arrived, Batiste and the other officers entered the store.  Once inside the store, the officers did not see anyone and, when they called out, received no response.  The officers searched the store — with the exception of the manager's office, which was locked — and found no one.  Through their dispatcher, the officers contacted the store director, Vonda Morales, who brought an office key to the store.  When the officers opened the office door, they found the bodies of two store employees, Angela Sanchez and Kola Osemwengie.  Batiste then requested medical assistance and subsequently notified the Houston Police Department's homicide division.  Batiste further testified that he had known the complainants by name from having seen and spoken to them during his patrols of the store area, and he identified [Cooper] as someone he had seen working at the store before September 4, 2001.

Harris County Assistant Medical Examiner Dr. Paul Shrode testified that, based on the findings of the autopsies performed by Dr. Delbert Van Dusen, both of the complainants had died from fatal gunshot wounds to the head.  Sanchez had been shot once in the back of the head.  Osemwengie had been shot twice: the first bullet had traveled through the palm and out the back of his right hand, and then into his forehead; the second bullet had entered his brain from the right side of his head.  Dr. Shrode noted that the evidence of stippling on the palm of Osemwengie's right hand was consistent with a weapon having been fired between six and 18 inches from his hand.  When asked whether he thought it was possible that the person who had shot the complainants could have done so while standing in the doorway of the store office, Dr. Shrode testified that he did not think that it was a "reasonable option."

Houston Police Department Sergeant W. Wendel testified that he and his partner, former Houston Police Officer F. Hale, were assigned to investigate the shootings.  In his investigation of the crime scene, Wendel found that a surveillance tape was missing from the VCR located in the manager's office and that the complainants' keys were missing.  Wendel also noticed that the store cash registers showed that the last entry had occurred at about 11:00 p.m.

Houston Police Officer E. Aguilera testified that, as a member of the crime scene unit, he investigated the scene of the shootings.  No shell casings were recovered from inside the video store office, which Aguilera testified was

consistent with someone having used a revolver to shoot the complainants. Houston Police Department Firearms Examiner K. Downs testified that she examined the three bullets and their fragments removed from the complainants, and she determined that the bullets had all been fired from the same weapon — either a .38 special or a .357 magnum revolver.

Morales testified that [Cooper] had worked at the store for about 90 days and had been fired on August 27, 2001, about one week before the shootings. She explained that the store was equipped with a video surveillance camera that recorded events inside the store onto a tape in a VCR in the manager's office. Only a manager or a shift leader has a key to the manager's office, and, during the time that [Cooper] was employed at the store, he did not have such a key. The store office also contained a safe — used to keep the store's "house money" — which was found to be empty at the time that the police officers discovered the complainants' bodies. Morales noted that this safe could have been opened only by Osemwengie. Morales also testified that, sometime between 7:30 p.m and 8:00 p.m. on the night of the shootings, she had called the store and had told Osemwengie that she had left [Cooper]'s final paycheck in the cash drawer at the front of the store. Wendel testified that, during his inspection of the store, he had not found [Cooper]'s paycheck.

Batiste testified that the complainants' cars were not found in the parking lot of the video store, but that Osemwengie's car was recovered the following day in the parking lot of a grocery store.

[Cooper]'s twin brother, Broderick Cooper, testified that, at the time of the shootings, he and [Cooper] were living in an apartment together, along with their cousin, Michael Walls. On the morning after the shootings, [Cooper] and Walls came to the apartment, and Broderick noticed that Walls was carrying a backpack containing a gun, some money, and a videotape. [Cooper] and Walls counted the money and gave $400 to Broderick, who used the money to pay the rent. In Broderick's opinion, as between [Cooper] and Walls, Walls was "the leader," "the stronger individual," and "the only one that talked about what [had] happened" at the video store the night before.

Lynn Fisher, a former co-worker of [Cooper]'s, testified that she knew [Cooper] because they had previously worked together. At the time of the shootings, Fisher worked as a cashier at Wal-Mart, along with [Cooper]'s girlfriend at the time, Shavonne Pippens, and Fisher had heard about the events at the video store. Two days after the shootings, Fisher gave Pippens a ride to Pippens's apartment, where they picked up [Cooper], and the three then

4

continued on in Fisher's car to her apartment. As they drove to her apartment, Fisher asked [Cooper] what he had done with the gun and the videotape after the shootings. With respect to both, [Cooper] had told her that he had "got[ten] rid of it." After leaving Pippens and [Cooper] at the apartment, Fisher picked up [Cooper]'s mother and brought her to the apartment "so she could talk him into turning himself in" to the authorities. When they returned to Fisher's apartment, [Cooper] was gone. The following day, Fisher gave a statement to the police officers investigating the shootings.

Shavonne Pippens testified that, at the time of the shootings, she had been [Cooper]'s girlfriend. When the officers investigating the shootings initially interviewed her, Pippens gave them a statement indicating that she did not know anything about the events at the store and that [Cooper] had not told her anything about it. However, Pippens later changed her statement, but could not remember the substance of her second statement. She explained that she had changed her statement because she had felt threatened by the investigating officers, because the officers told her "if I didn't tell them what they wanted to hear that they was going to take my daughter away from me and give me 20 years in jail."

Three days after the murders, [Cooper], accompanied by his mother and sister, went to the Houston Police Department's homicide division to give a statement concerning his knowledge of the events. Former Houston Police Officer F. Hale testified that he met with [Cooper] at about 10:00 a.m. on September 7, 2001 and discussed [Cooper]'s knowledge of the events at the video store. [Cooper] gave Hale a written statement, which was admitted into evidence. In his written statement, [Cooper] explained that, on the evening of September 4, 2001, he had gone to the video store, had picked up his last paycheck sometime between 9:00 p.m. and 9:30 p.m., had then left the store, and had spent the night at a girlfriend's apartment. In his written statement, [Cooper] denied having "anything to do with this homicide." At trial, [Cooper] acknowledged that, before he gave his written statement, Hale had read several warnings to [Cooper] concerning, among other things, [Cooper]'s legal rights to remain silent, to have a lawyer present, and to terminate the interview and that, after he gave Hale the statement, [Cooper] had initialed each of the warnings on the statement form and signed it.

Hale testified that he also asked [Cooper] if [Cooper] would provide a set of fingerprints and submit to a polygraph examination, and [Cooper] consented to do both. [Cooper] provided Hale with a set of fingerprints, and, at about noon, Hale took [Cooper] to a polygraph examiner.

5

Based on the evidence obtained in their investigation of the shootings, Hale and Wendel obtained an arrest warrant for [Cooper] that day and arrested him at approximately 3:15 p.m. while he was still taking the polygraph examination.[2]  [Cooper] was then taken to an interview room where Sergeant Wendel interviewed him and informed him that he was a suspect in the murders.  Wendel then turned [Cooper] over to Houston Police Officer J. Swaim for further questioning.  Swaim testified that he interviewed [Cooper] from 3:30 p.m. to approximately 4:15 p.m. and that, at that time, [Cooper] denied any involvement in the shootings.

Houston Police Officer T. Miller testified that, a few minutes later, he also interviewed [Cooper].  During this interview, Miller played, in [Cooper]'s presence, a portion of a tape-recorded statement given by Pippens, in which Pippens had stated that [Cooper] had told her that he had been the person who had committed the murders.  Miller also informed [Cooper] that Fischer had given a statement implicating [Cooper] in the crime.  [Cooper] then told Miller that Pippens and Fischer were lying.  After Miller and [Cooper] discussed the impact of the murders on the complainants' families, [Cooper] asked for a cigarette and then admitted to Miller that he had been involved in the crime and had shot the complainants.  [Cooper] then consented to give a recorded statement.  Miller again advised [Cooper] of his legal rights[3] and, after [Cooper] agreed to waive his rights, Miller recorded [Cooper]'s statement.

In his recorded statement, [Cooper] told Miller that, on the evening of September 4, 2001, [Cooper] completed the class he was attending at about 8:15 p.m. and then called the video store to talk to Osemwengie to find out if [Cooper]'s last paycheck was at the store.  When he learned that his check was at the store, [Cooper] told Osemwengie that he would come pick it up that evening.  [Cooper] stated that he then went home and got his backpack, which contained a .357 handgun, and he and his cousin, Michael Walls, discussed robbing the video store.  The two men then walked to the store, arriving "a little bit after [10:00 p.m.]."  [Cooper] stated that, after he and Walls arrived at the store, he picked up his paycheck from Osemwengie, pretended to browse the store's selection of movies, and took the handgun out of the backpack and put it in his pocket.  [Cooper] waited until all of the store's customers were gone and then pulled the gun out of his pocket and told Osemwengie and Sanchez to "go in the office and . . . give me the money."  [Cooper] stated that

---

[2]      [Cooper] did not complete the polygraph examination.

[3]      *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon 1979 & Supp. 2004-2005).

he and Walls then took the complainants into the store office and told them to sit down. Osemwengie opened the store safe and gave the money to [Cooper], and Walls put the money in the backpack and left the office. [Cooper] also instructed Osemwengie to remove the videotape from the store's surveillance camera and to give it to him, and Osemwengie complied.

With regard to the shootings, [Cooper] stated as follows:

> [S]o after he got all the money he had left out the office. And I, and I told [Osemwengie], and I say ya'll just turn around and I'm gonna leave. And ya'll, it'll be like that, and [Osemwengie] was telling me, we was cool. And I say, it ain't nothing against you [Osemwengie], I just needed some money so I'm gonna leave after that. And so, as I was turning around walking out the door, I was halfway out the door and I had put the gun back in my pocket. And I heard [Sanchez] telling [Osemwengie] that she was gonna call the police and tell them [inaudible] just robbed them and they was leaving. And, and something just snapped . . . .

[Cooper] stated that he then turned around and shot Sanchez once and Osemwengie twice. [Cooper] and Walls then took the complainants' car keys and drove the complainants' cars to [Cooper]'s apartment — [Cooper] drove Osemwengie's car and Walls drove Sanchez's car. [Cooper] and Walls counted the money at [Cooper]'s apartment and then put the gun, the bullets, some papers from the store, and the store surveillance tape in a bag to throw away. The two men then drove the complainants' cars to a grocery store parking lot and left them there. [Cooper] stated that they also threw the bag containing the items from the store into a trash can next to a bus stop.

The following day, when [Cooper]'s twin brother, Broderick Cooper, noticed that [Cooper] and Walls had some money and asked where they got it, [Cooper] did not tell his brother where the money had come from. Later that day, [Cooper] went to see Pippens at her apartment, and she began to cry when she saw that [Cooper] was interested in watching a news report of the murders at the video store. [Cooper] stated that he did not admit to Pippens that he had killed the complainants, but told her that he "knew who did it." [Cooper] also stated that he subsequently admitted to his ex-girlfriend, Shamona Williams, that he had killed the complainants.

During his tape-recorded statement, [Cooper] agreed to show Officer Miller where he and Walls had discarded the bag containing the gun and store surveillance videotape. Miller testified that, after [Cooper] completed his recorded statement, Miller got [Cooper] some food and then he and Houston Police Sergeant R. Parish drove [Cooper] to the bus stop where [Cooper] had indicated that he had discarded the bag of items. They arrived at the bus stop at about 6:00 p.m., and Miller looked through the trash can identified by [Cooper], but found nothing. Metro Transit Authority employee J. Capetillo testified that, according to his log sheet, as part of his job duties, he had cleaned the area around and had emptied the trash can at that bus stop on the day before the officers had searched it.

Miller also testified that [Cooper] showed the officers where, in a nearby grocery store parking lot, he and Walls had left the complainant's cars. Miller explained that the parking lot, which was across the street from [Cooper]'s apartment complex, was located approximately 1.5 miles from the video store. [Cooper] identified Sanchez's car, which was still parked in the lot. [Cooper] then agreed to show the officers where his ex-girlfriend, Williams, lived because he thought that Walls might be staying there. The officers then drove [Cooper] to the apartment complex where Williams lived, but Walls could not be located. At about 7:30 p.m., Miller turned [Cooper] over to Sergeant Wendel and Officer Hale. Wendel and Hale then took [Cooper] before a magistrate, who informed [Cooper] of his legal rights[4] and set a bond. [Cooper] was then transported to jail.

[Cooper] testified that he and Walls planned for [Cooper] to enter the store alone on the pretext of picking up his remaining paycheck. Walls would then enter the store later and force the complainants into the office so that [Cooper] could empty the cash register drawers unsuspected. [Cooper] admitted that, on the night of the shootings, he and Walls had gone to the video store in an attempt to carry out their plan. [Cooper] explained, however, that, as he was taking money from the cash registers, he heard three gunshots in the back of the store where Walls had taken the complainants. Walls then came running out of the office, carrying Sanchez's keys, and [Cooper] asked him, "What happened?" Both men then ran out of the store, took the complainants' cars, and drove to [Cooper]'s apartment. That night, [Cooper] and Walls stayed at the apartment of [Cooper]'s former girlfriend, Shamona Williams, and then returned to [Cooper]'s apartment the next morning. [Cooper] denied

---

[4]     *See* TEX. CODE CRIM. PROC. ANN. art. 15.17(a) (Vernon Supp. 2004-2005).

that he ever had the backpack in his possession and denied that he ever planned to kill, or to assist in killing, the complainants.

[Cooper] admitted that his written statement, in which he had denied any involvement in the events at the video store, was false. [Cooper] also admitted that Fisher had given him a ride after the shootings, but he denied ever telling her that he had been involved. [Cooper] also testified that he had fabricated portions of his tape-recorded statement; specifically, the portions concerning whether he or Walls had shot the complainants and whether he and Walls had ever disposed of the gun and the store surveillance videotape in a trash can at a bus stop. [Cooper] explained that he had "made up" the fact that he and Walls had disposed of the videotape in the trash can he had later pointed out to the investigating officers; however, on cross-examination, [Cooper] conceded that, had the officers located the videotape, it could have shown that [Cooper] had not shot the complainants.

[Cooper] also testified that, before he gave his tape-recorded statement, Officer Miller grabbed him by the front of his shirt, pushed him against the wall of the interview room, and told [Cooper] that he was "tired of putting up with me saying I didn't have no involvement in it and he knew I did." When asked why he had confessed to police officers to two murders that he testified he did not commit, [Cooper] stated, "I was taught not to snitch on people that wasn't caught in the involvement of a case that I got caught up in."

*Cooper v. State*, No. 01-03-00835-CR, 2004 WL 2415433, at *1-*6 (Tex. App. — Houston Oct. 28, 2004) (footnotes in original). Thereafter, the Texas Court of Criminal Appeals refused Cooper's petition for discretionary review.

Cooper challenged his conviction further by filing a state habeas corpus application under Article 11.07 of the Texas Code of Criminal Procedure. In that proceeding, Cooper complained that (1) his confession was coerced; (2) his arrest was unlawful; (3) his sentence was illegal; and (4) he was denied effective assistance of counsel at his trial. The state habeas corpus court, which also presided over Cooper's trial, entered findings of fact and concluded that Cooper was not entitled to relief. The Texas Court of Criminal Appeals

remanded the case for additional findings on Cooper's ineffective-assistance claim. The state habeas corpus court entered supplemental findings of fact on November 18, 2008, concluding that Cooper failed to establish a valid ineffective-assistance claim. The Texas Court of Criminal Appeals agreed and denied relief on February 25, 2009, without a written order. *See Ex parte Cooper*, Nos. 69,098-01 & 69,098-02.[5]

Cooper now seeks a federal writ of habeas corpus to challenge his state court conviction under 28 U.S.C. § 2254. [Doc. # 1]. Cooper contends that he is entitled to relief for the following reasons: (1) the trial court erred by denying the motion to suppress his confession; (2) the trial court improperly excluded testimony from his brother, Broderick Cooper; and (3) his trial counsel was ineffective. The respondent has filed a motion for summary judgment, arguing that Cooper fails to show that he is entitled to federal habeas corpus relief. [Doc. # 11]. The parties' contentions are addressed below under the applicable federal habeas corpus standard of review.

## II.    STANDARD OF REVIEW

The respondent's motion for summary judgment must be determined in compliance with the federal habeas corpus statutes. *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir.

---

[5]     Cooper filed a *pro se* state habeas application on August 25, 2005. *See Ex parte Cooper*, No. 887345-A. Thereafter, the state habeas corpus court appointed counsel, who filed a second application on Cooper's behalf along with support for his claims. *See Ex parte Cooper*, No. 887345-B. The state courts assigned separate numbers to Cooper's *pro se* habeas application and to the application filed by appointed counsel. *See Ex parte Cooper*, Nos. 69,098-01 & 69,098-02. Because the state court records for these proceedings are substantially similar in content, all further references in this order will be to the state court records found in No. 69,098-02.

2002); *see also Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). Federal habeas corpus proceedings filed after April 24, 1996 are governed by provisions of the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA was enacted, at least in part, to ensure comity, finality, and deference to state court determinations by limiting the scope of collateral review and raising the standard for federal habeas relief. *See Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (citations omitted). As the Supreme Court has explained, the federal habeas corpus statutes amended by the AEDPA, codified at 28 U.S.C. § 2254(d), set forth a "highly deferential standard for evaluating state-court rulings, . . . , which demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal citation omitted). Specifically, the AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (quotation omitted).

To the extent that the petitioner's claims were adjudicated on the merits in state court, the AEDPA standard applies. For claims adjudicated on the merits, the AEDPA standard provides that a petitioner is not entitled to relief unless he shows that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court

11

or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 404-08 (2000); *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir. 2009).  A state court unreasonably applies clearly established precedent if it identifies the correct governing legal principle but unreasonably applies that principle to the facts of the case.  *Brown v. Payton*, 544 U.S. 133, 141 (2005).  Under this standard, an unreasonable application is more than merely incorrect or erroneous; rather, the state court's application of clearly established law must be "objectively unreasonable." *Williams*, 529 U.S. at 409.  The focus of this objective reasonableness inquiry is on the state court's ultimate decision, not whether the state court "discussed every angle of the evidence." *Dale v. Quarterman*, 553 F.3d 876, 879 (5th Cir. 2008) (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc)), *cert. denied*, — U.S. —, 130 S. Ct. 367 (2009).

The deferential AEDPA standard of review applies even where the state court fails to cite applicable Supreme Court precedent or fails to explain its decision.  *See Early v. Packer*, 537 U.S. 3, 7 (2002).  Likewise, a federal habeas corpus court's inquiry under § 2254(d)(1) is not altered where the state court denies relief without a written opinion.  *See Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003).  For such a situation, a reviewing court (1) assumes that the state court applied the proper "clearly established Federal law"; and (2) then determines whether its decision was "contrary to" or "an objectively unreasonable application of" that law.  *Id.* (citing *Catalan v. Cockrell*, 315 F.3d 491, 493 & n.3 (5th Cir. 2002)).

A state court's findings and conclusions are entitled to deference unless the petitioner shows that they are "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2); *Bunton v. Quarterman*, 524 F.3d 664, 670 (5th Cir. 2008), *cert. denied*, — U.S. —, 129 S. Ct. 1306 (2009). A state court's findings of fact are presumed to be correct on federal habeas review, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption extends not only to express findings of fact, but to the implicit findings of the state court as well. *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citations omitted). The petitioner's claims in this case are addressed below under the deferential AEDPA standard.

## III.   DISCUSSION

### A.   Cooper's Confession

Cooper complains that the trial court erred by denying his motion to suppress a tape-recorded statement to the police, in which he confessed to shooting his former co-workers while robbing the Hollywood Video store. Cooper alleges that his confession was not voluntarily made. Thus, he appears to complain that his statement was admitted in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), which generally precludes the use of involuntary statements made during custodial interrogation against an accused at trial.

In *Miranda*, the Supreme Court outlined certain rights of which suspects must be advised by law enforcement officers before custodial interrogation takes place. These rights include: (1) the right to remain silent; (2) that any statement made may be used against them

at trial; (3) the right to the presence of an attorney during questioning; and (4) if a suspect cannot afford an attorney, one will be appointed for him.  *See id.*, 384 U.S. at 478-79.  These familiar procedural safeguards, commonly known as "*Miranda* rights," are designed to protect an accused's Fifth Amendment privilege against self-incrimination during custodial interrogation.[6]  *See Gachot v. Stalder*, 298 F.3d 414, 418 (5th Cir. 2002).  It is well established that, once an accused has invoked these rights, he is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

Of course, a suspect may waive his *Miranda* rights.  *See Maryland v. Shatzer*, — U.S. —, 130 S. Ct. 1213, — (2010) (citing *Miranda*, 384 U.S. at 475).  To establish that such a waiver is valid, "the State must show that the waiver was knowing, intelligent, and voluntary" under the standard found in *Johnson v. Zerbst*, 304 U.S. 458 (1938), which requires proof of an intentional relinquishment or abandonment of a known right or privilege. *Shatzer*, 130 S. Ct. at — (citing *Miranda*, 384 U.S. at 475).  A voluntary statement based on a valid waiver is admissible in a criminal trial.  *Miranda*, 384 U.S. at 478; *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996).  The test for determining voluntariness is well-established:

---

[6]    The Fifth Amendment privilege against self-incrimination provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.

14

> Is the confession the product of an essentially free and unconstrained choice by its maker?  If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (internal quotation marks and citation omitted).  To establish that an inculpatory statement was involuntary, the defendant bears the burden to show that but for police coercion he would not have given the confession. *See Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986); *Muniz v. Johnson*, 132 F.3d 214, 219 (5th Cir. 1998).  To meet this burden, a defendant must demonstrate that it resulted from coercive police conduct by establishing a link between the alleged coercive conduct and the defendant's confession.  *See Connelly*, 479 U.S. at 163-65; *Hopkins v. Cockrell*, 325 F.3d 579, 584 (5th Cir. 2003).  The state court found that Cooper failed to make the requisite showing that his confession was involuntarily made.

The state court of appeals observed that, before giving his statement to police, Officer Hale gave the requisite warnings "concerning, among other things, [Cooper]'s legal rights to remain silent, to have a lawyer present, and to terminate the interview and that, after he gave Hale the statement, [Cooper] had initialed each of the warnings on the statement form and signed it."  *Cooper*, No. 01-03-00835-CR, 2004 WL 2415433, at *3.  Because Cooper does not dispute the state court findings on this issue, these findings of fact are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).  Cooper does not show that police failed to afford him the warnings required by *Miranda* and he does not dispute that he waived his *Miranda* rights.

15

For reasons articulated by the state court of appeals, which addressed his claim at length,

Cooper does not otherwise show that his confession was coerced or involuntarily given:

> In his first point of error, [Cooper] argues that the trial court erred in denying his motion to suppress the tape-recorded statement that [Cooper] gave to the investigating police officers because the statement was not given voluntarily.[7]

> We review a trial court's denial of a motion to suppress evidence for an abuse of discretion. *Oles v. State*, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999). A trial court abuses its discretion when it acts without reference to any guiding rules or principles by acting arbitrarily or unreasonably. *Galliford v. State*, 101 S.W.3d 600, 604 (Tex. App. — Houston [1st Dist.] 2003, pet. ref'd). We will afford almost total deference to a trial court's determination of historical facts supported by the record, especially when the findings are based on an evaluation of the credibility and demeanor of the witnesses. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing a ruling on a question of application of law to facts, we review the evidence in the light most favorable to the trial court's ruling. *Id.*

> At the hearing on his motion to suppress evidence, [Cooper] testified that, after he gave his written statement, the officers told him that he would not be permitted to leave until he had also provided them with some fingerprints and had taken a polygraph test. [Cooper] admitted that, after he was later arrested, he never requested a lawyer, but he explained that he did not think that he was entitled to have a lawyer at that time. [Cooper] explained that, at the time that he gave his recorded statement, he was scared and felt that the officers questioning him were "trying to pressure me to say I done it." [Cooper] described his questioning by Sergeant Swaim and by Officer Miller, in part, as follows:

> > Well, I been there all day, I got tired of being in there, and then as I kept denying it, they — I could see they was getting mad;

---

[7] The trial court made its ruling denying [Cooper]'s motion to suppress evidence as part of the pretrial proceedings of [Cooper]'s first trial, which ended in a mistrial. However, the parties stipulated that (1) "all pretrial motions filed before the last trial . . . shall be considered as filed before and ruled on prior to this trial," (2) the trial court could carry forward its pretrial rulings, and (3) such rulings and proceedings "shall be considered as part of th[e] trial record" in [Cooper]'s second trial.

but the last two officers . . . they are the ones that put their hands on me in the thing. They didn't physically, with their fist [balled] up, but they was grabbing my clothes . . . . They didn't physically put their hands on me but they was grabbing the front of my shirt telling me they got people in other rooms saying I did it, so I might as well tell them I done it.

[Cooper] testified that, just before he gave his recorded statement, he "broke down and cried" and that he felt that he had been forced to give the recorded statement so that the officers would leave him alone.

Officer Miller testified that he never put his hands on [Cooper] or threatened him and did not see any other officers threaten [Cooper]. [Cooper] never asked Miller for a lawyer, never asked to stop the interview, and never told Miller that any other officer had threatened him. Sergeant Swaim testified similarly. The State presented testimony from Hale, Wendel, and Miller that, at the time that [Cooper] (1) gave his written statement, (2) was arrested, and (3) gave his tape-recorded statement, he was informed of his legal rights to remain silent, to have an attorney present, and to terminate any questioning and that [Cooper] had indicated that he understood and voluntarily agreed to waive those rights. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon 1979 & Supp. 2004-2005). [Cooper] placed his initials next to these warnings on the form of his written statement, and he subsequently indicated that he understood these warnings when they were recited to him during his tape-recorded statement. At trial, when questioned by [Cooper]'s counsel as to why the investigating officers had continued to question [Cooper] after he had denied any involvement in the shootings, Swaim responded

My job was to get him to tell the truth. We didn't feel like he was telling the truth, that he had no involvement. We believed he was involved; and it was my job to get him to go and attempt to get him to tell the truth.

In determining whether [Cooper]'s recorded statement was given voluntarily, the trial court was required to evaluate and weigh the credibility of the testimony of the officers against that of [Cooper]. In announcing its findings at the conclusion of the hearing on [Cooper]'s motion to suppress evidence, the trial court specifically noted that it found the testimony of Hale, Wendel, Swaim, and Miller to be credible and that it found [Cooper] to be not credible. We defer to this finding, as it is based on an evaluation of the

17

credibility and demeanor of the witnesses who testified in the trial court. *Guzman*, 955 S.W.2d at 89.

*Cooper*, No. 01-03-00835-CR, 2004 WL 2415433, at *6-*7 (footnoted in original).  Thus, with the requisite deference to credibility findings made during the suppression hearing, the court of appeals held that "the trial court did not abuse its discretion in denying [Cooper]'s motion to suppress his recorded statement on the grounds that it was given involuntarily." *Id.* at *7.

While the voluntariness of a confession is a matter of law subject to independent federal determination, the trial court's findings on credibility and subsidiary fact questions concerning whether the police engaged in coercive tactics are entitled to the presumption of correctness.  *See Miller v. Fenton*, 474 U.S. 104, 112 (1985); *see also Marshall v. Lonberger*, 459 U.S. 422 (1983) (observing that the applicable habeas corpus statute "gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them").  Where there has been a live hearing with conflicting evidence, "[a] trial court's credibility determinations . . . are entitled to a strong presumption of correctness and are 'virtually unreviewable' by the federal courts." *Pippen v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005) (quotation and citation omitted).

In support of his claim, Cooper repeats the same allegations that were raised and rejected on direct appeal. [Docs. # 1, # 15].  Cooper does not show, however, that any of the state court finding's were incorrect.  *See* 28 U.S.C. § 2254(e)(1).  Cooper further fails to establish that his confession was unlawfully coerced or that the trial court erred by denying

his motion to suppress.  Absent a showing that his confession was coerced and admitted at trial in violation of the United States Constitution, Cooper fails to establish that the state court's decision to reject this claim is contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.  Accordingly, the respondent is entitled to summary judgment on this issue.

### B.    Exclusion of Testimony

Cooper complains that the trial court erred by excluding certain testimony from his brother, Broderick Cooper ("Broderick"), about an out-of-court "statement against penal interest" made by Cooper's cousin and co-defendant, Michael Walls.  In that regard, Walls reportedly told Cooper's brother, Broderick, that he was responsible for shooting the robbery victims.  Although Cooper gave a detailed confession to police, admitting that he shot the two store clerks after he "snapped," Cooper argues that his brother's testimony about Wall's out-of-court statement should have been admitted and that the trial court erred by sustaining the State's objection based on the prohibition against hearsay.

To the extent that Cooper faults the trial court's evidentiary ruling, the admissibility of evidence is a matter governed by state law.  Even assuming that there was an error, an alleged violation of state law does not merit federal habeas corpus relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  A federal habeas corpus court will not grant relief from errors in a state trial court's evidentiary rulings, if any, unless those errors resulted in a "denial of fundamental fairness" under the Fourteenth Amendment Due Process Clause. *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998) (citing *Porter v. Estelle*, 709 F.2d 944, 957

(5th Cir. 1983)).  As discussed further below, Cooper fails to establish that the trial court's ruling was incorrect or that his trial was tainted by fundamental error in this case.

The state court of appeals examined the trial court's evidentiary ruling at length.  After considering the trial transcript, which included a bill of review made by defense counsel, the court of appeals held that the trial court did not err by excluding Walls' out-of-court statement because Cooper failed to establish that it was trustworthy or that it fit within a recognized exception to the hearsay rule:

> In his fourth point of error, [Cooper] argues that the trial court erred in sustaining the State's objection to and excluding the testimony of [Cooper]'s brother, Broderick, that Walls admitted to Broderick that Walls had shot and killed the complainants at the video store.  [Cooper] contends that his brother's testimony about Walls' statement was admissible because the statement was against Walls' interest.  *See* TEX. R. EVID. 803(24).

> Generally, hearsay statements are inadmissible. TEX. R. EVID. 802. However, certain types of hearsay are admissible as exceptions to this general rule, including

>> [a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in his position would not have made the statement unless believing it to be true.

> TEX. R. EVID. 803(24). In a criminal case, a statement that tends to expose a declarant to criminal liability is not admissible "unless corroborating circumstances clearly indicate the trustworthiness of the statement."  *Id*.

> The consideration of the admissibility of a statement under [R]ule 803(24) requires a two-step inquiry.  A trial court must determine (1) whether the statement in question tends to expose the declarant to criminal liability and (2) whether corroborating circumstances exist that clearly indicate the

trustworthiness of the statement. *Bingham v. State*, 987 S.W.2d 54, 57 (Tex. Crim. App. 1999). The requirements of [R]ule 803(24) are met only if both criteria are satisfied. *Id*.

Although there is no definitive test by which to gauge the existence of corroborating circumstances, the Court of Criminal Appeals has looked to (1) whether the guilt of the declarant is inconsistent with the guilt of the accused, (2) whether the declarant was so situated that he might have committed the crime, (3) the time of the declaration and its spontaneity, (4) the party to whom the declaration was made, and (5) the existence of independent, corroborating facts. *Davis v. State*, 872 S.W.2d 743, 749 (Tex. Crim. App. 1994); *Holliday v. State*, 14 S.W.3d 784, 787 (Tex. App. — Houston [1st Dist.] 2000, pet. ref'd). The focus of this inquiry is on verifying, to the greatest extent possible, the trustworthiness of the statement, so as to avoid the admission of a fabrication. *Bingham*, 987 S.W.2d at 58. We review a trial court's decision to admit or to exclude a hearsay statement offered under [R]ule 803(24) for abuse of discretion. *Id*. at 57.

Here, as noted above, Broderick testified that, the morning after the shootings, [Cooper] and Walls, who were living with Broderick, came to Broderick's apartment. Broderick noticed that Walls was carrying a backpack containing a gun, some money, and a videotape. [Cooper] and Walls counted the money and gave $400 to Broderick, who used the money to pay the rent. In Broderick's opinion, as between [Cooper] and Walls, Walls was "the leader," "the stronger individual," and "the only one that talked about what [had] happened" at the video store.

Outside the presence of the jury, [Cooper] offered Broderick's testimony that, while [Cooper] was taking a shower at the apartment that morning, Walls admitted to Broderick that Walls had shot and killed the complainants during the video store robbery "because they can find out who [Cooper] was because he used to work there." [Cooper] offered this testimony as a hearsay exception, under [R]ule 803(24).

There is no dispute that the statement attributed to Walls is a statement against interest, in that it subjects him to potential criminal liability for the murders of the complainants. Thus, the first criterion of [R]ule 803(24) is satisfied. *See Bingham*, 987 S.W.2d at 57. However, at the hearing outside the presence of the jury, the trial court inquired of [Cooper]'s counsel as follows:

21

> The Court:   Section 24 [of Rule 803] on statement against interest clearly says in criminal cases a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. What corroborating circumstances do you offer?

> Counsel:   I don't have any.

> Thus, [Cooper] presented no argument or evidence to the trial court supporting the second criterion of [R]ule 803(24), concerning the trustworthiness of the statement. *See id*. Accordingly, we hold that the trial court did not abuse its discretion in sustaining the State's objection to and excluding Broderick's testimony concerning Walls' alleged statement against interest.

*Cooper*, No. 01-03-00835-CR, 2004 WL 2415433, at *9-*10. Finding insufficient corroborating evidence of trustworthiness, the court of appeals rejected Cooper's argument that Walls' out-of-court statement should have been admitted. *Id.*

Cooper does not dispute that the proposed statement by Wells was hearsay and he does not contend that the trial court applied an incorrect rule when it determined that the out-of-court statement failed to fit within an exception to the hearsay rule. *See* TEX. R. EVID. 803(24); *Bingham v. State*, 987 S.W.2d 54, 57 (Tex. Crim. App. 1999). Cooper does not demonstrate that the trial court violated state law by excluding the testimony and, in light of his confession, he further fails to establish that his entire proceeding was rendered unfair as a result. Absent a showing that his trial was rendered fundamentally unfair as the result of the disputed evidentiary ruling, Cooper does not demonstrate that the state court's decision to deny relief was contrary to, or involved an unreasonable application of, clearly established

Supreme Court precedent.  Accordingly, Cooper is not entitled to a federal writ of habeas corpus on this issue.

### C.    Ineffective Assistance of Counsel – Trial

In a related claim, Cooper complains that Walls' hearsay statement would have been admissible if his trial counsel had presented sufficient corroborating evidence of its trustworthiness.  Cooper contends, therefore, that he was denied effective assistance of counsel because his attorney failed to get the hearsay statement admitted into evidence.

The Supreme Court has recognized that the Sixth Amendment guarantees criminal defendants the right to have the assistance of counsel at trial.  *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).  The right to counsel guaranteed by the Sixth Amendment includes "the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  Claims for ineffective assistance of counsel are analyzed under the well-established standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail under the *Strickland* standard, a defendant must demonstrate both constitutionally deficient performance by counsel and actual prejudice as a result of the alleged deficiency.  *See Williams v. Taylor*, 529 U.S. 390, 390-91 (2000).  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that rendered the result unreliable."  *Strickland*, 466 U.S. at 687.

Counsel's performance is constitutionally deficient if it falls below an objective standard of reasonableness.  *See id*. at 687-88.  To demonstrate deficient performance on his counsel's part, a petitioner must show that "counsel made errors so serious that counsel was

not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. That is, the defendant must overcome the presumption that, under the circumstances, "the challenged action might be considered sound trial strategy." *Riley v. Dretke*, 362 F.3d 302, 305 (5th Cir. 2004).

Deficient performance, standing alone, is not sufficient to prevail under *Strickland*. Once a petitioner establishes error by his defense counsel, then he must still demonstrate actual prejudice as a result of his counsel's deficient performance. Performance is prejudicial only if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" in this context is "a probability sufficient to undermine confidence in the outcome." *Id*.

Cooper maintains that his counsel was deficient because she failed to introduce sufficient evidence to corroborate the hearsay statement reportedly made by Walls to Cooper's brother, Broderick.[8] Cooper notes that his defense counsel should have re-called

---

[8]     As noted above, a hearsay statement is admissible under Rule 803(24) of the Texas Rules of Evidence, if (1) the statement "tends to expose the declarant to criminal liability" and (2) "corroborating circumstances exist that clearly indicate the trustworthiness of the statement." *Bingham v. State*, 987 S.W.2d 54, 57 (Tex. Crim. App. 1999). A summary of the trial, which
(continued...)

Broderick to the stand for the purpose of presenting additional corroborating evidence in support of Walls' statement.  Cooper notes that he denied shooting the victim's during his own testimony at trial and that this should have been enough to corroborate the out-of-court statement made by Walls, as reportedly relayed to Broderick, that he was the shooter. Cooper appears to contend, therefore, that his counsel was deficient for failing to re-call Broderick for the purpose of re-offering Walls' statement after Cooper's testimony.

Cooper's trial counsel, Katherine Scardino, provided more than one affidavit in response to the allegations of ineffectiveness.  *See Ex parte Cooper*, No. 69,098-02 at 72-74; Supp. Rec. at 12-14.   Ms. Scardino acknowledged that she did not attempt to re-call Broderick Cooper.  *See Ex parte Cooper*, No. 69,098-02 at 72. Ms. Scardino explained that, if she had re-called Broderick Cooper to the stand, then he would have been subject to renewed cross-examination about statements made by the defendant, Roderick Cooper.  *See id.* at 73.   Initially, Ms. Scardino declined to be more specific, citing the attorney-client privilege that protects information held in confidence.  *See id.*  Scardino acknowledged that

---

[8](...continued)
is also set forth above, reflects that the defense attempted to introduce Walls' inculpatory out-of-court statement through testimony from Cooper's brother, Broderick.  *See Court Reporter's Record*, vol. 29.  Broderick testified that he saw Walls on the morning after the shooting with a backpack that contained a gun, money, and a videotape.  The backpack and its contents were never located.  After a brief hearing outside the jury's presence, the trial court sustained the prosecutor's hearsay objection to proposed testimony about the out-of-court statement by Walls, who reportedly told Broderick that he shot the robbery victims. *See id.* at 119-20. Although Broderick testified about the statement during a bill of review outside the jury's presence, the trial court determined that it was not sufficiently corroborated and that it was inadmissible hearsay under the rules of evidence.  *See id.* at 216-19.

Cooper denied shooting the victims his own testimony at trial, but she doubted that his testimony, standing alone, was sufficient corroboration or that Cooper's testimony could support the admission of Walls' hearsay statement against penal interest.[9]  *See id.*

In a second, more detailed affidavit, Ms. Scardino added that it was her "firm belief that there were no corroborating circumstances indicating that Michael Walls' statement against interest was trustworthy." *Ex parte Cooper*, No. 69,098-02 [Supp. Rec.] at 12.  She explained that the defense attempted to locate a witness who might have seen the missing backpack, which contained the videotape and the gun used in the robbery/murder, but could find none.  *See id.* at 13.  More importantly, Ms. Scardino's investigator interviewed Broderick Cooper and found his credibility to be "very weak." *Id.*  In support of this opinion, she includes her investigator's written report of the interview, which shows that Broderick Cooper gave conflicting accounts of the statement given by Walls and that he seemed confused.  *Id.* at 15-18.  It appeared to the investigator that Cooper "had rehearsed parts of the story and knew them well, while other parts he made up as he went along, frequently realizing that they did not match the details mentioned earlier." *Id.* at 18. Ms. Scardino agreed that, based on her own interview with Broderick Cooper, his credibility was questionable.  *Id.* at 13.  After she shared this information with her client, Ms. Scardino reported that Cooper "shared the same concerns about his brother testifying at all." *Id.*  Ms.

---

[9]     In fact, Texas courts have recognized that an accused may not corroborate an out-of-court statement against penal interest through his own self-serving testimony.  *See Cunningham v. State*, 846 S.W.2d 147, 150 (Tex. App. — Austin 1993), *aff'd*, 877 S.W.2d 310 (Tex. Crim. App. 1994).

Scardino emphasized, nevertheless, that "if there had been any corroborating evidence at all, even a small amount, [she] would have attempted to convince the judge to allow Broderick's testimony about the statement to be presented to the jury." *Id.* at 14.

The state habeas corpus court that the facts contained in Ms. Scardino's affidavit were "true and credible." *Ex parte Cooper*, No. 69,098-02 at 76. Based on the details provided in Ms. Scardino's affidavit, and the trial transcript, the state habeas corpus court found that defense counsel was not deficient because there was no corroborating evidence to present in support of the hearsay statement's admissibility:

1.  Katherine Scardino (Scardino) personally interviewed Broderick Cooper (Applicant's twin brother), who indicated that Michael Walls (Walls) made out-of-court statements about shooting the robbery victims and (b) was carrying a backpack containing a gun, some money, and a videotape;

2.  Scardino unsuccessfully attempted to locate (a) a witness who might have seen the backpack containing the gun and videotape or (b) the backpack itself;

3.  Scardino's private investigator interviewed Broderick Cooper and concluded that his credibility was weak;

4.  After personally interviewing Broderick Cooper, Scardino likewise believed that his credibility was weak;

5.  Applicant also expressed concerns with Broderick Cooper testifying during trial based upon credibility issues;

6.  Scardino could not locate any independent evidence of the trustworthiness of Broderick Cooper's potential testimony about Walls' out-of-court statement against penal interest;

7.      Scardino informed the trial court that she did not have any corroborating circumstances clearly indicating that Walls' out-of-court statement against penal interest was trustworthy;

8.      In support of the instant habeas allegation, Applicant essentially relies upon testimony from Broderick Cooper and Applicant as the evidence corroborating circumstances to establish the trustworthiness of Walls' out-of-court statement against penal interest;

9.      There were no corroborating circumstances clearly indicating that Walls' out-of-court statement against penal interest was trustworthy;

10.     Even if Scardino had re-offered the purported evidence of corroborating circumstances during trial, this Court would not have admitted Broderick Cooper's testimony about Walls' statement against penal interest because this Court did not believe that this evidence was sufficient to clearly indicate the trustworthiness of Walls' out-of-court statement;

11.     The totality of representation afforded Applicant was sufficient to protect his right to reasonably effective assistance of counsel; and

12.     Applicant has failed to demonstrate that his conviction was improperly obtained.

*Ex parte Cooper*, No. 69,098-02 Supp. Rec. at 76-77.  The Texas Court of Criminal Appeals agreed with the state habeas corpus court's ultimate conclusion that Cooper was not denied effective assistance of counsel at trial and denied his habeas corpus application without further comment.

The state court's decision is supported by the record in this instance. Cooper presents nothing that would call into question the state court's fact findings or credibility determinations, which are entitled to the presumption of correctness on federal habeas

review.  28 U.S.C. § 2254(e)(1).  Likewise, Cooper does not any allege specific facts or show that independent corroborating evidence was available and admissible, but that his defense counsel failed to present it.  Cooper's conclusory allegations are insufficient to demonstrate deficient performance or actual prejudice.  *See Day v. Quarterman*, 566 F.3d 527, 540-41 (5th Cir. 2009); *see also Lincecum v. Collins*, 958 F.2d 1271, 1279 (5th Cir. 1992) (denying habeas relief where petitioner "offered nothing more than the conclusory allegations in his pleadings" to support claim that counsel was ineffective for failing to investigate and present evidence). Based on this record, Cooper does not show that he was denied effective assistance of counsel or establish a constitutional violation.  More importantly, Cooper fails to demonstrate that the state court's decision to reject his ineffective-assistance claims was contrary to, or involved an unreasonable application of, the well-settled *Strickland* standard. Accordingly, Cooper is not entitled to relief on this issue.  Because Cooper has failed to demonstrate a valid claim for relief in this case, the respondent is entitled to summary judgment.

## IV.   CERTIFICATE OF APPEALABILITY

The habeas corpus petition filed in this case is governed by the Antiterrorism and Effective Death Penalty Act, codified as amended at 28 U.S.C. § 2253, which requires a certificate of appealability before an appeal may proceed.  *See Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997) (noting that actions filed under either 28 U.S.C. § 2254 or § 2255 require a certificate of appealability).  "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of

appealability, an appeal may not be taken to the court of appeals . . . .'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citing 28 U.S.C. § 2253(c)(1)).

A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Under the controlling standard, this requires a petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336. Where denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

A district court may deny a certificate of appealability, *sua sponte*, without requiring further briefing or argument. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). For all of the reasons discussed above, the court concludes that jurists of reason would not debate whether any procedural ruling in this case was correct or whether the petitioner stated a valid claim of the denial of a constitutional right. Therefore, a certificate of appealability will not issue.

## V.     CONCLUSION AND ORDER

Based on the foregoing, the court **ORDERS** as follows:

1.       The respondent's motion for summary judgment [Doc. # 11] is **GRANTED**.

2.       The petition for a writ of habeas corpus [Doc. # 1] is **DENIED**, and this case is **DISMISSED** with prejudice.

3.       A certificate of appealability is **DENIED**.

The Clerk shall provide a copy of this order to the parties.

SIGNED at Houston, Texas, on March 31st, 2010.

Nancy F. Atlas
United States District Judge